## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

IN RE:  METHOD OF PROCESSING )
ETHANOL BYPRODUCTS AND         )
RELATED SUBSYSTEMS ('858)      ) Master Case:      1:10-ml-02181-LJM-DML
PATENT LITIGATION              ) Related Case:     1:13-mc-00058-LJM-DML

## <u>Supplemental Order on Motion to Quash in Related Case</u>

On July 23, 2013, the court issued its Order on Motion to Quash in Related

Case.  That order granted in part and denied in part CleanTech's motion to quash a

deposition subpoena served on attorney Charles O'Brien.  The court decided that

the defendants can take Mr. O'Brien's deposition and seek documents from him, but

that discovery is limited to Mr. O'Brien's participation in and knowledge regarding

decision-making about disclosures or omissions from disclosure to the PTO about

the inventors' interactions with Agri-Energy in 2003 and 2004, including testing

and diagrams and drawings conducted or prepared in 2003.  The court directed the

parties to file supplemental briefing addressing the application of the attorney-

client privilege and the work product doctrine.  The court also required the

defendants to file a revised document request so that the court can determine the

categories of documents that either must be produced or scheduled on a privilege log

in advance of Mr. O'Brien's deposition.[1]

---

[1]      This supplemental order implements the court's July 23, 2013 order.  The
defendants' briefing of the motion to quash Mr. O'Brien's involvement
in deciding the scope of disclosures to the PTO regarding the Agri-Energy "story."
No arguments were presented regarding any other matters for which Mr. O'Brien
played a role in preparing disclosures to the PTO.  In the defendants' response to

The court has carefully considered the parties' arguments concerning the attorney-client privilege and work product doctrine. As explained below, the court finds that as to the attorney-client privilege, there is insufficient showing (a) to find that CleanTech has expressly or impliedly waived the privilege or (b) to invoke the crime-fraud exception. The court further finds that the work product doctrine does not prevent discovery of decision-making regarding disclosures or omissions from disclosure to the PTO. Therefore, Mr. O'Brien must produce documents concerning,[2] and must answer deposition questions regarding, his participation in and decisions he made with respect to disclosures or omissions from disclosure to the PTO "regarding the inventors' interactions with Agri-Energy in 2003 and 2004," including those connected with (a) the First Cantrell Affidavit, (b) the Second Cantrell Affidavit, and (c) the 2003 testing and diagrams and drawings prepared or existing in 2003.

The law of the Federal Circuit applies to the attorney-client privilege and work product issues raised here because they concern discovery relevant to the inequitable conduct defense to a patent infringement claim, which is a substantive

the court's solicitation of supplemental briefing on the attorney-client and work product privilege issues that obviously would arise in a document production and deposition of Mr. O'Brien, they now seek discovery relating to many matters not directly related to Mr. O'Brien's participation in the Agri-Energy disclosures to the PTO. (*See* Dkt. 25 at pp. 1-2). The court's July 23, 2013 order limited the document production and deposition of Mr. O'Brien to Agri-Energy matters and those limits remain in place. This order does not contemplate or permit discovery from Mr. O'Brien on other subjects.

[2]     The extent of the required document production is addressed in Section III of this order.

patent law issue.  *In re EchoStar Communications Corp.,* 448 F.3d 1294, 1298 (Fed. Cir. 2006) (internal citation omitted) ("'Federal Circuit law applies when deciding whether particular written or other materials are discoverable in a patent case, if those materials relate to an issue of substantive patent law.")

## I.        The Attorney-Client Privilege

The attorney-client privilege protects from forced disclosure confidential communications between client and lawyer when the purpose of the communication was to secure or provide legal advice in connection with obtaining a patent.  *In re Spalding Sports Worldwide, Inc.,* 203 F.3d 800, 806 (Fed. Cir. 2000) (quoting *Sperry v. Florida,* 373 U.S. 379, 383 (1963) ("[T]he preparation and prosecution of patent applications for others constitutes the practice of law.")  Absent waiver or an exception to the privilege, Mr. O'Brien may refuse to produce documents that are attorney-client communications and may refuse to answer questions about the contents of his communications with CleanTech.[3]

The defendants offer two grounds for piercing the privilege.  First, they argue that CleanTech waived the privilege by putting at issue its good faith before the PTO and its reliance on counsel to determine the content of disclosures to the PTO. Second, they argue that the crime-fraud exception vitiates the privilege.  As addressed below, the court determines that CleanTech has not to date taken any action that constitutes an express or implied waiver of the privilege.  It also

---

[3]        The extent of any attorney-client relationship between Mr. O'Brien's law firm and inventors David Cantrell and David Wisness as to patent prosecution matters is not clear to the court.  Nothing in the parties' papers addresses this matter.

determines that there is an insufficient evidentiary foundation for the crime-fraud exception.

## A. Express and Implied Waiver

The attorney-client privilege may be waived by the client. The privilege is expressly waived when the client discloses the contents of his communication with counsel or is impliedly waived when the client puts "at issue" counsel's advice to him. *Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP,* 684 F.3d 1364, 1370 (Fed. Cir. 2012) (attorney-client privilege is waived by implication where party does not expressly disclose his lawyer's advice but "makes the content of his attorney's advice relevant to some claim or defense in the case"). When the privilege is waived—expressly or impliedly—the waiver extends to all communications "relating to the same subject matter." *In re Seagate Technology, LLC,* 497 F.3d 1360, 1372 (Fed. Cir. 2007). Determining the breadth of waiver or, put another way, determining what constitutes the "subject matter" is a question grounded in fairness based on the principle that a litigant may not use his privilege as both a sword (by disclosing only those communications he believes provide an advantage) and a shield (by refusing to disclose communications that may be unfavorable or that should be disclosed for a fair analysis of that which was disclosed). *Id.* Thus, the scope of waiver depends on weighing "'the circumstances of the disclosure, the nature of the legal advice sought, and the prejudice to the parties of permitting or prohibiting further disclosures.'" *Id.* (quoting *Fort James Corp. v. Solo Cup Co.,* 412 F.3d 1340, 1349-50 (Fed. Cir. 2005)). *See also In re Rhone-Poulenc Rorer, Inc.,* 1998

WL 968489 at *2 (Fed. Cir. 1998) (unpublished) (implied waiver occurs where litigant asserts a claim "that in fairness requires examination of protected communications").

There is no contention that CleanTech has disclosed the contents of any particular attorney-client communication. Rather, the defendants contend that CleanTech has waived the privilege by putting its counsel's advice at issue to counter the defendants' claims of inequitable conduct before the PTO. The record before the court does not, however, show that CleanTech affirmatively has put its counsel's advice at issue. It has not indicated that it intends to *rely* on advice of counsel.

The deposition testimony of Kevin Kreisler, who is CleanTech's CEO, and of Mr. Edward Carroll, who is CleanTech's president and CFO, does not establish an affirmative use of advice of counsel. Both men were asked by the defendants' counsel about who made decisions regarding what was disclosed and not disclosed to the PTO with respect to certain of the inventors' interactions with Agri-Energy and regarding generally what CleanTech "should be doing vis-à-vis the patent office." *See* excerpts of deposition testimony at Dkt. 25, pp. 9-10. They answered that management made those decisions in conjunction with counsel, including discussions with attorneys Peter Hagerty, Charles O'Brien, and Michael Rye.[4]

---

[4] Mr. Hagerty is a patent attorney who, beginning in about March 2008, acted as CleanTech's primary patent counsel before the PTO. Mr. O'Brien and Mr. Rye are CleanTech's lead litigation counsel in these MDL infringement cases. There is evidence that Mr. O'Brien drafted documents for submission to the PTO and made decisions regarding the content of disclosures to the PTO. There is evidence that

Based on that testimony and an interrogatory answer that CleanTech "believe[s] that it complied with its duties of disclosure and candor" to the PTO, the defendants argue that CleanTech must be attempting to assert its good faith reliance on advice of counsel while at the same time refusing to disclose the contents of the advice.

The interrogatory answer and deposition testimony—at least at this point—demonstrate nothing more than a routine state of affairs for every patent prosecution client who is represented by an attorney before the PTO.  It is unremarkable for a client to answer, when asked, that he received his counsel's advice about the appropriate content of disclosures to the PTO.  The defendants cannot force CleanTech to waive the confidentiality of their communications with counsel by eliciting testimony that CleanTech looked to its lawyers for advice, or by a benign interrogatory answer that CleanTech believes it did nothing wrong. Unless and until CleanTech of its own volition asserts that the disclosures (and alleged omissions from disclosure) regarding the inventors' interactions with Agri-Energy were made in good faith because CleanTech was following its lawyers' advice, there is no foundation for an implied waiver of the attorney-client privilege. *See, e.g., Harter v. University of Indianapolis,* 5 F.Supp.2d 657, 665 n.2 (S.D. Ind. 1998) ("Only when the client seeks to take advantage of the privileged communications themselves should a waiver be found on the theory that the client has put the attorney's advice in issue.")

---

Mr. Rye participated with Mr. O'Brien in decisions regarding disclosures to the PTO.

In all of the defendants' cited cases regarding express and implied waiver of the attorney-client privilege, the client had voluntarily used the fact and content of his attorney's advice to explain away the alleged inequitable conduct before the PTO. The inventor in *Nilssen v. Osram Sylvania, Inc.,* 528 F.3d 1352 (Fed. Cir. 2008), who represented himself in applying for eleven patents in the name of his company, was accused of a wide-range of deceitful conduct before the PTO, including that he took fee discounts not allowed for his company. At trial, the inventor testified that he believed the discounted fee applied based on the advice of his tax attorney. The court concluded that the testimony waived the attorney-client privilege and permitted the defendant to take the attorney's deposition. *Id.* at 1356.

In *Winbond Electronics Corp. v. International Trade Comm'n,* 262 F.3d 1363 (Fed. Cir. 2001), the patentholder similarly explained that what appeared to be deceptive conduct in omitting to name a person as an inventor and the timing of the correction of that omission was based on a misunderstanding of the law later corrected through advice given to the inventor by counsel. The inventor's obtaining of and reliance on that advice was used as the foundation for the patentholder's successful petition to the PTO to correct the inventorship of the patent, thus saving the patent from invalidity. There was no dispute that the attorney-client privilege had been waived; the issue before the court was the temporal scope of the waiver. *Id.* at 1375-76. *In re Rhone-Poulenc Rorer, Inc.,* 1998 WL 968489 (Fed. Cir. 1998) (unpublished), similarly involved an inventor's affidavit testimony that relied on his ignorance of the law to explain conduct before the PTO. The district court

determined that the inventor had put at issue the scope of legal advice he had received and thereby impliedly waived the attorney-client privilege. The Federal Circuit ruled that the district court's decision was not so indisputably erroneous that it should be overturned on a writ of mandamus, but that the issue could be raised on appeal after final judgment. *Id.* at *2.

In *Pall Corp. v. Cuno, Inc.,* 268 F.R.D. 167 (E.D.N.Y. 2010), the patentholder put into evidence affidavit testimony of his patent prosecution counsel to prove good faith in dealings with the PTO. The patentholder did not dispute that when the PTO learned in a second reexamination proceeding of certain documents that had not been originally disclosed in the first reexamination proceeding, the examiner rejected numerous claims in the patent. The defendant argued that these facts proved inequitable conduct in the first reexamination. The patentholder countered with affidavit testimony of its attorney to demonstrate good faith. The use of the attorney's testimony impliedly waived the attorney-client privilege. *Id.* at 169.

In *Martin Marietta Materials, Inc. v. Bedford Reinforced Plastics, Inc.,* 227 F.R.D. 382 (W.D. Pa. 2005), the client relied on its in-house counsel's testimony regarding her discussions with the inventors, advice she received from outside counsel, and her communications with management to explain that it had not deliberately secreted certain information from the patent examiner with an intent to mislead. The court, not surprisingly, found that by asserting as an "essential element of its defense [to having intentionally deceived the PTO] that it relied upon

the advice of counsel, the party waived the privilege regarding communications pertaining to that advice." *Id.* at 390.

This court has no indication that CleanTech or the inventors intend to use the fact or content of any communications with and advice from counsel (whether their original patent prosecution counsel or lawyers at Cantor Colburn) as evidence of good faith dealings with the PTO. There is thus no basis, at this point, on which to find an express or implied waiver of the attorney-client privilege.[5]

## B. The Crime-Fraud Exception

The defendants also raise the crime-fraud exception to the attorney-client privilege. In *In re Spalding Sports Worldwide, Inc.,* 203 F.3d 800 (Fed. Cir. 2000), the district court ordered the production of a privileged communication between the inventor and his counsel because there was evidence that a "material misrepresentation may have been made to the PTO, which resulted in the issuance of the patent at issue." *Id.* at 808. The Federal Circuit issued a writ of mandamus

---

[5] In one case cited by the defendants, the magistrate judge required the plaintiff patentholder to produce documents withheld on attorney-client privilege grounds and to permit their attorneys to testify to attorney-client communications unless the client stipulated that it will not attempt to "prove during trial Plaintiffs' 'good faith' with respect to disclosures made or omitted from being made to PTO in support and prosecution" of the patent. *Echometer Co. v. Lufkin Industries, Inc.,* 2002 WL 87323 at *2 (N.D. Tex. Jan. 16, 2002). This judge is not willing to impose such a requirement at this stage. It is not manifest that an inequitable conduct claim must be met with affirmative evidence of good faith or that evidence of good faith must depend on an advice of counsel foundation. In *Therasense, Inc. v. Becton, Dickinson and Co.,* 649 F.3d 1276, 1291 (Fed. Cir. 2011) (internal citation omitted), the Federal Circuit ruled that a "'patentee need not offer any good faith explanation unless the accused infringer first . . .prove[s] a threshold level of intent to deceive by clear and convincing evidence.'" At some point, the court could require formal proffers from the parties regarding their evidence on the inequitable conduct defense and determine on that record whether to revisit the waiver analysis.

and vacated the district court's order.  The court ruled that without a *prima facie* showing of fraud on the PTO, there was no basis for applying the crime-fraud exception to the privilege.  The court looked to case law addressing the concept of fraud on the PTO in the context of antitrust claims.  *Walker Process Equip., Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965) (holding that a patent procured by fraud on the PTO loses its legal monopoly and concomitant exemption from the antitrust laws); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998) (deciding the elements necessary to prove for an antitrust claim that a patent was procured by "*Walker Process* fraud").

Borrowing from the antitrust cases, the *Spalding* court ruled that a crime-fraud exception to the attorney-client privilege based on fraud on the PTO requires proof of its common law elements.  There must be "independent and clear evidence" that a false representation or omission of a material fact was made to the PTO with the intent to deceive (or a state of mind so reckless that it may be deemed the equivalent of deceptive intent), upon which the PTO relied to issue the patent.  *Id.* at 807-08.  There must be a "clear showing of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission." *Id.* at 807.  The *Spalding* court found that because there was no indication that the attorney-client communication at issue was made in furtherance of a fraud during the prosecution of the patent, there was no basis for vitiating the privilege based on the crime-fraud exception.  It also distinguished an inequitable conduct claim from *Walker Process* fraud, noting that inequitable conduct is a "lesser offense than common law fraud"

because *Walker Process* fraud on the PTO "requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct."  *Id.*

The Federal Circuit's distinction in *Spalding* between common law or *Walker Process* fraud on the PTO and an inequitable conduct defense has been substantially eroded by *Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1287 (Fed. Cir. 2011) (*en banc*).  As this court noted in its July 23, 2013 order, *Therasense* announced new and tougher standards to govern the inequitable conduct defense, which now requires proof by clear and convincing evidence of a specific intent by the patentee to deceive the PTO,[6] and proof of "but-for" materiality (or reliance by the PTO in allowing a claim) in nearly all circumstances. Only where there is "affirmative egregious misconduct" is proof of but-for materiality not necessary.  In that circumstance, the patentee's egregious acts to deceive the PTO serve as a proxy for materiality because "a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that the falsehood will affect issuance of the patent."  *Id.* at 1292.  Because of the congruence of the concepts of common law fraud and inequitable conduct as described in

_____

[6]       Proof of the intent element is especially difficult.  In addition to requiring a clear and convincing quality of proof, the intent to deceive "must be 'the single most reasonable inference able to be drawn from the evidence'" and the evidence "'must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.'"  *Therasense,* 649 F.3d at 1290 (internal citations omitted) (emphasis in original).

*Therasense,* the court also commented that a "finding" of inequitable conduct may prove the crime or fraud exception to the attorney-client privilege. *Id.* at 1289.[7]

The defendants' filings to date provide an insufficient foundation of proof of the crime-fraud exception. The facts that the district court has allowed the inequitable conduct defense to proceed and that this magistrate judge has determined that some additional discovery is appropriate regarding Agri-Energy disclosures to the PTO do not provide a basis for piercing the privilege. Moreover, the defendants have not pinpointed any specific attorney-client communications susceptible to characterization as "in furtherance" of fraud or the "affirmative egregious acts" described in *Therasense.* Rather, they maintain that all attorney-client communications related to Agri-Energy (and other matters) are subject to the crime-fraud exception. A stronger, and more specific, showing must be made before the court will take the extraordinary step of requiring the disclosure of privileged attorney-client communications. *See Unigene,* 655 F.3d 1352, 1358-59 (Fed. Cir.

_____

[7] CleanTech maintains that because *Therasense* permits a finding of inequitable conduct based on "affirmative egregious misconduct" that does not meet all of the elements of common law or *Walker Process* fraud, then inequitable conduct based on the egregious misconduct prong never meets the crime-fraud exception to the attorney-client privilege. CleanTech cites a post-*Therasense* decision in which the Federal Circuit stated that *Walker Process* fraud must be established to pierce the attorney-client privilege under the crime-fraud exception. *Unigene Laboratories, Inc. v. Apotex, Inc.,* 655 F.3d 1352, 1359 (Fed. Cir. 2011). The *Unigene* court did not discuss *Therasense* and relied solely on earlier decisions that directly addressed the crime-fraud exception to the privilege. In particular, it did not mention the statement in *Therasense* that inequitable conduct may prove the crime-fraud exception. Though unnecessary to decide now, the court is not convinced that *Unigene* meant to exclude from the crime-fraud exception any conduct that is sufficiently egregious in the post-*Therasense* context to invalidate a patent even if there is no showing that the patent would not have issued but for that conduct.

2011) (requiring "clear evidence" establishing a prima facie case of fraud before "pierc[ing] the attorney-client privilege under the crime-fraud exception").

That is not to say that the defendants have made no showing relevant to a crime-fraud analysis or the inequitable conduct defense. They have presented some evidence from which inferences may be drawn that:

1. In light of all the surrounding circumstances, the July 31, 2003 letter to Agri-Energy *may* constitute an offer of sale more than one year before the first patent application was filed and the inventors or CleanTech took action before the Patent Office based on a belief that the July 31, 2003 letter may constitute an offer of sale.

2. In light of all the surrounding circumstances, the inventors or CleanTech made disclosures to the PTO based on the letter—and surrounding events such as the 2003 Bench Test—being characterized as an offer of sale but one which was first made in mid-August 2003, but then changed theories and made decisions regarding disclosures to support new theories.

3. In light of all the surrounding circumstances, a trier of fact *may* not believe Mr. Cantrell's testimony that the erroneous statements in his First Cantrell Declaration were an honest mistake and *may* determine that Mr. Cantrell knew, or acted with reckless disregard whether, certain statements were false.

4. In light of all the surrounding circumstances, CleanTech took action before the PTO with respect to the timing and content of disclosures regarding Agri-Energy that had the effect of minimizing and providing an incomplete picture of the significance of the July 31, 2003 letter and its relationship to other contacts with Agri-Energy.

But at this point and without further development and presentation of evidence and its link to specific communications, the court will not permit the defendants to discover attorney-client communications on any subject related to prosecution of the patents or to ask Mr. O'Brien (or other deponents) to reveal them.

## II.    The Work Product Doctrine

The work product doctrine has its genesis in *Hickman v. Taylor,* 329 U.S. 495 (1947), and is codified at Fed. R. Civ. P. 26(b)(3).  The Rule provides that documents and tangible things prepared in anticipation of litigation or for trial by a party or his representative may not be discovered unless a party shows it has a substantial need for the material and cannot, without undue hardship, obtain substantial equivalent information by other means.  It further provides that if a court orders discovery of work product, the court must protect against disclosure of the "mental impressions, conclusions, opinions, or legal theories" of a party's attorney concerning the litigation.  Fed. R. Civ. P. 26(b)(3)(B).  With respect to the latter— opinion work product—the Federal Circuit (along with many other courts) recognizes that even when opinion work product is not in tangible written form, it falls within the Rule because "[o]therwise, attorneys' files would be protected from discovery, but attorneys themselves would have no work product objection to depositions."  *In re Seagate Technology, LLC,* 497 F.3d 1360, 1376 (Fed. Cir. 2007).

"Anticipation of litigation" is a critical component to a characterization of tangible or intangible information as work product.  As the Federal Circuit described in *Seagate,* the work product doctrine is "'designed to balance the needs of the adversary system: promotion of an attorney's preparation in representing a client versus society's general interest in revealing all true and material facts to the resolution of a dispute."  *Id.* at 1375 (quoting *In re Martin Marietta Corp.,* 856 F.2d 619, 624 (4th Cir. 1988)).  It protects the adversary process itself based on a belief

"'that the integrity of our system would suffer if adversaries were entitled to probe each other's thoughts and plans concerning the case.'" *Id.* (quoting *Coastal States Gas Corp. v. DOE,* 617 F.2d 854, 864 (D.C. Cir. 1980)).  *See also In re EchoStar Communications Corp.,* 448 F.3d 1294, 1301 (Fed. Cir. 2006) (internal citation omitted) ("We recognize work-product immunity because it promotes a fair and efficient adversarial system by protecting 'the attorney's thought processes and legal recommendations' from the prying eyes of his or her opponent.'").

Where the issue has been addressed directly, there is a general consensus among courts that the work product doctrine does not apply to patent prosecution work because patent prosecution is not an adversarial, litigation-type proceeding, but a wholly *ex parte* proceeding before the PTO.[8]  The comments by the court in *Bulk Lift International, Inc. v. Flexcon & Systems, Inc.,* 122 F.R.D. 482, 491 (W.D. La. 1988) (quoting *Detection Systems, Inc. v. Pittway Corp.,* 96 F.R.D. 152, 155 (W.D.N.Y. 1982)), are typical:

> In patent cases, work-product immunity is not 'extended to preparations for *ex parte* proceedings such as patent proceedings,' *Choat v. Rome Industries, Inc.,* 462 F. Supp. 728, 732 (N.D. Ga. 1978); *Hercules v. Exxon Corp.,* 434 F. Supp. 136, 152 (D.Del. 1977).  In reviewing this set of documents, it is clear that the materials were prepared and concern an *ex parte* proceeding before the Patent Office, and therefore, Pittway's claims of immunity cannot shield the documents from discovery.

---

[8]     Some administrative proceedings before the PTO are adversarial in nature. The Third Circuit, in *In re Natta,* 410 F.2d 187, 192-93 (3d Cir. 1969), ruled that documents reflecting an attorney's opinions in the context of a patent interference proceeding before the PTO could be withheld as work product.

The *Bulk* court required patent prosecution counsel to appear for deposition and produce documents (other than attorney-client communications) that involved "the application and prosecution of the *ex parte* patent applications" because they do not constitute matters prepared in anticipation of litigation. 122 F.R.D. at 491. The court in *Choat v. Rome Industries, Inc.,* 462 F. Supp. 728 (N.D. Ga. 1978), required the production of "papers relating to the preparation and prosecution" of certain patent applications possessed by counsel because work product "'immunity should be limited to preparations for contested proceedings and should not be extended to preparations for *ex parte* proceedings such as patent prosecutions.'" *Id.* at 732 (*quoting Interlego A.G. v. F.A.O. Schwarz, Inc.,* 196 U.S.P.Q. 8, 12 (N.D. Ga. 1977)). The court in *Hercules, Inc. v. Exxon Corp.,* 434 F. Supp. 136 (D. Del. 1977), stressed both the *ex parte* nature of a patent prosecution and the patent applicant's and his lawyer's duty of candor to the PTO in explaining why work product immunity does not extend to documents generated primarily for prosecuting a patent application:

> The prosecution of an application before the Patent Office is not an adversary, but an *ex parte* proceeding. Although the process involves preparation and defense of legal claims in a quasi-adjudicatory forum, the give-and-take of an adversary proceeding is by and large absent. In addition, implicit in the applicant's duty of full disclosure to the Patent Office is the attorney's responsibility to make a complete investigation of the merits of the applicant's claim. A blanket rule permitting claims of work product as to any documents generated in anticipation of a patent prosecution is therefore unnecessary to provide additional incentive for the attorney to investigate and prepare the application fully.

*Id.* at 152.

The *Hercules* court went on to note, however, that patent prosecution lawyers often anticipate future litigation involving the patent so that "[i]t is possible that, during the *ex parte* prosecution, certain memoranda or recordings, etc. prepared by the attorney may reflect concerns more relevant to future litigation than to the ongoing prosecution." *Id.* The court described separating information for which the lawyer's primary concern was "claims which would potentially arise in future litigation," and that for which the primary concern was "claims which have arisen or will arise during the *ex parte* prosecution of the application." *Id.*

Inquiry into the "primary motivating purpose" is the generally accepted standard for determining whether information created for dual purposes is work product or not. *E.g., United States v. Gulf Oil Corp.,* 760 F.2d 292, 296 (Temp. Emer. Ct. App. 1985) (requiring production of letters written by attorneys to auditors regarding pending litigation because the primary motivating purpose for creating the document was not assisting in pending or impending litigation but to satisfy public company's financial reporting responsibility); *Binks Mfg. Co. v. National Presto Indus., Inc.,* 709 F.2d 1109, 1118-1119 (7th Cir. 1983) (citing *Janicker v. George Wash. Univ.,* 94 F.R.D. 648, 650 (D.D.C. 1982)) (document prepared in investigation of accident not work product unless it is shown that, in light of the surrounding events, the primary motivating purpose for its creation was *because* of litigation as opposed to ordinary business need to investigate); *Stout v. Illinois Farmers Ins. Co.,* 852 F. Supp. 704, 706-07 (S.D. Ind. 1994) (where

document "is initially created with a dual purpose and the litigation purpose is not primary, then that document will not be privileged" work product).

Some courts have applied the "primary motivating" purpose test when patent prosecution is undertaken at the same time that patent litigation is anticipated or pending by using a bright-line rule. In *Application of Minebea Co., Ltd.,* 143 F.R.D. 494 (S.D.N.Y. 1992), the court determined a date by which the patent applicant first anticipated litigation and ruled that work product protection applied to all work performed in the *ex parte* prosecution of the patent subsequent to that date. *Id.* at 500-501. The court was persuaded by an argument that after a certain date when litigation was anticipated, "all work performed to prosecute [two patent applications] was also performed in anticipation of litigation." *Id.* at 500. The court prevented discovery of the opinions and mental impressions held by patent prosecution counsel as to any matters post-dating the date that litigation was anticipated. *Id.* at 501.

Borrowing from *Minebea,* the courts in *In re Gabapentin Patent Litig.,* 214 F.R.D. 178 (D.N.J. 2003), and *Softview Computer Products Corp. v. Haworth, Inc.,* 2000 WL 351411 (S.D.N.Y. Mar. 31, 2000), also determined that although documents pertaining to the patent application process generally cannot constitute work product, if actual or anticipated litigation exists during the patent application process, then anything created after the date litigation reasonably was anticipated enjoyed work product protection. *Gabapentin,* 214 F.R.D. at 186; *Softview,* 2000 WL 351411 at *12 (allowing work product protection for documents pertaining to patent

application because they were created after a date that litigation was anticipated and thus "were prepared with subsequent litigation in mind"). *See also Burroughs Wellcome Co. v. Barr Labs, Inc.,* 143 F.R.D. 611, 624 (E.D.N.C. 1992) (court prevented discovery on work product grounds of documents created "in furtherance of patent prosecution" because the possibility of patent-related litigation was imminent at the time the documents were created).

In this court's view, making the date litigation was anticipated the only touchstone threatens to eviscerate the general principle that an attorney's work in preparing and prosecuting a patent application is *not* work product at all because the work is for a non-adversarial *ex parte* proceeding. That mechanical test supplants the substantive inquiry of the primary motivating purpose test. That test is required in many circumstances precisely because litigation (or anticipated litigation) coincides with non-litigation reasons for the creation of a document or the generation of legal theories. Just as where the primacy of an ordinary business purpose for a lawyer's work defeats a work product claim, so should it where the primary purpose is the *ex parte* prosecution of the patent application, even when a litigation-related purpose may also be served.[9] As the court in *Hercules* stated, a

———————————————

[9] Picking a date by which litigation was anticipated sometimes is all that is necessary because any materials *before* that date could not be characterized as work product. For example, in *Info-Hold, Inc. v. Trusonic, Inc.,* 2008 WL 2949399 (S.D. Ohio July 30, 2008), the court ruled that the work product doctrine did not shield from disclosure a document prepared by patent prosecution counsel, finding that an "attorney's thought processes with respect to the preparation of a patent application are too distant in time to be considered as having been made 'in anticipation' of litigation." *Id.* at *4. *See also McNeil-PPC, Inc. v. Proctor & Gamble Co.,* 136 F.R.D. 666, 671 (D. Colo. 1991) (requiring patent prosecution attorney to disclose

"responsible" patent lawyer may be cognizant of litigation claims, but the concern cannot shield as work product documents created primarily because of "claims which have arisen or will arise during the *ex parte* prosecution of the application." 434 F. Supp. at 152.

Even those courts that have implicitly assumed that requests to discover the mental impressions of patent prosecution counsel as memorialized in documents and by deposition of the patent lawyer seek "work product" have permitted the discovery where the need for the information is critical. When that information is critically important and cannot reasonably be obtained except by obtaining documents reflecting counsel's mental impressions and by deposing counsel, then any work product objection must yield to the exigencies of the case. *See Alcon Labs, Inc. v. Pharmacia Corp.*, 225 F. Supp.2d 340 (S.D.N.Y. 2002) (permitting deposition of lawyer responsible for prosecution of patent where he was likely the only source of information regarding filings with the PTO, his testimony was critical to the defendant's inequitable conduct defense, and the lawyer's mental impressions "relevant to the [inequitable conduct] issue can only be discovered directly from him"); *Handgards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926, 932 (N.D. Cal. 1976) (where "alleged improprieties involved the activities of the very lawyer whose

---

thought processes and understanding at the time he prosecuted the patent, relying on cases finding that patent application work is too "distant in time" to be considered to have been in anticipation of litigation and a "patent is obtained in an *ex parte* proceeding and until that proceeding becomes adversarial in nature the work product rule has no application").

work product was sought," there is exceptional need for the discovery that justifies requiring the disclosure of the lawyer's opinions).

*Therasense* makes an inequitable conduct claim extraordinarily difficult to prove. The defendants' theory—with respect to Agri-Energy—includes the allegations (1) that inventor Cantrell signed declarations he knew were false or materially incomplete; (2) that patent prosecution counsel omitted certain disclosures, truncated certain disclosures, or timed certain disclosures in a manner that deceived the PTO examiner(s) regarding the inventors' contacts with Agri-Energy in 2003 and 2004 (and the existence of drawings and testing during that time-frame); and (3) that PTO examiner otherwise would have determined that the one year on-sale bar prevented issuance of the patents.

The burden on the defendants imposed by *Therasense* has the effect in this case of making the mental impressions and strategies of CleanTech's counsel with respect to their disclosures to the PTO regarding Agri-Energy substantive, fact evidence they reasonably need to support their claim.[10] The court does not rule that

---

[10] In protecting the attorney's notes and mental impressions from discovery in *Hickman v. Taylor,* 329 U.S. 385 (U.S. 1947), the Court emphasized that the attorney's work was not evidence and denying its discovery did not hinder the opposing party's ability to prepare his own case, discover facts for himself, and form his own mental impressions. *Id.* at 512-13. Even under *Hickman v. Taylor* or a Rule 26(b)(3) analysis, courts have permitted discovery into an attorney's mental impressions and strategies when those mental impressions and strategies have direct bearing on the proof of a claim or defense. The Federal Circuit in *In re Seagate Technology, LLC,* 497 F.3d 1360, 1375 (Fed. Cir. 2007), noted in describing general work product principles that opinion work product "'may be discovered and admitted when mental impressions are *at issue* in a case and the need for the material is compelling.'" *Id.* at 1375 (quoting *Holmgren v. State Farm Mut. Auto Ins.,* 976 F.2d 573, 577 (9th Cir. 1992)).

discovery into patent prosecution counsel's mental impressions should be permitted as a matter of course in all patent litigation in which an inequitable conduct claim is raised. Nor does the court rule that such discovery is reasonable for every inequitable conduct claim that has some independent evidentiary support. The court is satisfied that for this case, the defendants have made a sufficient evidentiary showing of potentially inequitable conduct surrounding the Agri-Energy disclosures to the PTO, that only by allowing inquiry into the lawyers' strategies and thought processes for those disclosures do the defendants have a fair opportunity to obtain fact evidence essential to proof of the inequitable conduct claim.

The court stresses that its decision to permit discovery of the mental impressions and decision-making surrounding the Agri-Energy disclosures to the PTO is grounded in the twin findings that (i) the patent application prosecution work for the *ex parte* proceedings before the PTO does not fit within work product protection as described in Rule 26(b)(3) and *Hickman v. Taylor*; and (ii) the mental impressions and strategy may be substantive evidence critical to the defendants' inequitable conduct defense. The court is not, however, permitting a free-for-all inquiry into *all* matters connected to Agri-Energy. It is permitting only inquiry focused specifically on disclosures to the PTO. And it is not permitting the defendants to depose Mr. Hagerty, Mr. O'Brien, and Mr. Rye about the same or similar matters when any one or two of them can provide the reasonably necessary information.

Because the prosecution of the patent applications and the MDL litigation cases has occurred at the same time and because some of the same lawyers (like Mr. O'Brien) have decided to both participate directly in patent prosecution matters and act as trial counsel, the court anticipates some difficulty in drawing the lines between information that must be provided (because the *ex parte* patent proceeding was a primary motivating purpose, rather than litigation) and that which may be withheld because the strategy, mental impressions, or documents relate primarily to the litigation and not patent prosecution before the PTO.  But as the court stresses, again, it is necessary to draw the lines—rather than forbid discovery—because the defendants have shown that their inequitable conduct claim regarding Agri-Energy disclosures  is substantial enough to merit discovery into the attorneys' thought-processes regarding the contents and timing surrounding those disclosures and non-disclosures.

The court does not intend to permit Mr. O'Brien to shield his patent prosecution work on the ground that mental processes and strategies for prosecuting the patent application were influenced by his litigation strategies. Because of the duty of candor to the PTO, the court cannot conceive how a primary motivating purpose for a disclosure to the PTO, or a decision not to disclose, is anything other than patent prosecution work.  By the same token, Mr. O'Brien may not be questioned directly about the nature of his litigation strategies, and he cannot volunteer them as a means to color his patent work as litigation work product.  *See Alcon Labs,* 225 F.Supp.2d 340, 344 (S.D.N.Y. 2002) ("a patent

prosecution attorney cannot avoid being deposed simply because he is later selected to act as trial counsel in an infringement action concerning the very patent he helped to prosecute"); *McNeil-PPC, Inc. v. Procter & Gamble Co.,* 136 F.R.D. 666 (D. Colo. 1991) (forbidding lawyer from claiming that his current knowledge of what he did in the past in prosecuting patent is litigation work product).[11]

The focus of document production and deposition testimony must be on strategies or mental impressions tied directly to the contents of disclosures, the timing of disclosures, and a lawyer's direct participation in deciding timing of disclosures and in preparing documents (or directing the contents of documents) that were filed with the patent office. With that focus, the court believes the primary purpose test presumptively will be met and that objections based on some implicit revelation of mental impressions for the litigation likely will not be appropriate.

Mr. Hagerty has perhaps the most first-hand information on these subjects. His relative lack of participation in the litigation also makes his testimony least prone to raise work product objections. The court is aware that he has refused to answer questions on work product grounds that, under this order, are not sustainable. The defendants may get an opportunity to depose him again, depending on whether Mr. O'Brien is able to answer the questions that Mr. Hagerty refused to. So, first, the defendants may depose Mr. O'Brien. Though CleanTech's

---

[11] Close calls may fall the defendants' way. By permitting its trial counsel to play a direct role in disclosures to the PTO, CleanTech risked exposing its litigators to discovery regarding those disclosures.

supplemental brief states that attorney O'Brien "did not make decisions regarding the disclosure of documents to the PTO of the inventors' interactions with Agri-Energy in 2003 and 2004," (Dkt. 24 at p. 8), the defendants have pointed to contrary testimony by attorney Hagerty. Mr. Hagerty testified that Mr. O'Brien took a lead role in preparing the Second Cantrell Declaration (*see* Hagerty Dep., Dkt. 11-29, at p. 205). CleanTech's privilege log (Dkt. 25-9) also indicates that Mr. O'Brien may have (though the court does not know whether he did) participated in decisions regarding the timing of disclosures to the PTO regarding the First Cantrell Declaration, the Second Cantrell Declaration, and the May 2004 testing.[12]

Mr. O'Brien must answer for himself regarding the nature of his participation in preparing documents for filing with the PTO regarding Agri-Energy, or otherwise making decisions on the contents and timing of the filing of those documents. Mr. O'Brien may also be asked—with respect to these same subjects—about his knowledge of Mr. Rye's participation, if any. The court is unlikely to permit the defendants to depose Mr. Rye unless they can make a strong showing that Mr. O'Brien was unable (or refused) to answer questions for which Mr. Rye is the best source of information. Further, depending on the extent of Mr. O'Brien's participation in the disclosures to the PTO and his ability to answer

---

[12] In *Avid Identification Systems, Inc. v. Crystal Import Corp.,* 603 F.3d 967 (Fed. Cir. 2010), the court stated that (a) persons "substantively involved" in the preparation or prosecution of a patent application owe a duty of candor to the PTO and (b) substantive involvement means involvement that "relates to the content of the application or decisions related thereto," which is not merely administrative or secretarial. *Id.* at 973-74.

questions regarding the timing and content of those disclosures, the court may permit the defendants to re-depose Mr. Hagerty.

### III. Documents to be Produced

The court has carefully reviewed the defendants' revised list of documents (Dkt. 25-8) as well as the list of privileged documents scheduled on CleanTech's privilege log that the defendants believe should be produced (Dkt. 25-9). Both seek information broader than the court permits under this order. As addressed in the first part of this order, the defendants are not entitled to attorney-client communications. As addressed in the second part of this order, the defendants are entitled to documents withheld as work product where the primary motivating purpose behind their creation relates to the contents of disclosures (or omissions from disclosure) to the PTO regarding Agri-Energy or the timing of those disclosures.

The court has reviewed the defendants' revised document List (Dkt. 25-8) and limited the categories of documents to those that appear sufficiently limited to PTO disclosures that the primary motivating purpose is likely patent prosecution. The court does not foreclose the possibility that any particular document falling within these categories was generated primarily because of the litigation, and not for prosecution of the patents. If CleanTech contends that any particular document is litigation centric and not patent-prosecution centric and may be withheld on that basis, CleanTech may submit the document for *in camera* review, following the

same procedure discussed below with respect to documents on CleanTech's privilege log.

With respect to the defendants' revised document list (Dkt. 25-8), the court orders Mr. O'Brien to produce within 14 days all documents within his and his law firm's control responsive to the following—except for documents that constitute attorney-client privileged communications and—and subject to the court's *in camera* review protocol:

4.      All documents relating to the July 31, 2003 Agri-Energy proposal and your decision making process for how it would be disclosed and/or characterized to the U.S.P.T.O., including but not limited to signed and/or unsigned original of said proposal.[13]

7.      All documents relating to the First Cantrell Declaration, including but not limited to drafts, notes, internal communications and communications with third-parties.  (The court has rewritten the request to eliminate the express request for communications with Applicants.)

8.       All documents relating to the Second Cantrell Declaration, including but not limited to drafts, notes, internal communications and communications with third-parties.  (The court has rewritten the request to eliminate the express request for communication with Applicants.)

---

[13]     The numbers of these paragraphs are taken from the defendants' revised document list at Dkt. 25-8.

9.      All documents relating to when and how to submit the July 31, 2003 Agri-Energy Proposal to the Patent and Trademark Office.

12.      All documents relating to your efforts to correct the falsity of the First Cantrell Declaration. [14]

With respect to the privilege log—meaning the documents appearing on Dkt. 25-9[15]—the court directs Mr. O'Brien to produce to the defendants (a) all documents for which an attorney-client privilege objection was *not* made or which does not otherwise constitute a communication between attorney and client and (b) all other documents for which only a work product objection was made and Mr. O'Brien (and CleanTech) cannot demonstrate that the primary motivating purpose for its creation was the litigation.  Because Mr. O'Brien and CleanTech have not had an opportunity to do so, they may submit to the Magistrate Judge for *in camera* review those documents they contend were created primarily because of the litigation.

------------------------------

[14]      The court finds that the request for documents (and testimony) concerning Mr. Rye's July 27, 2010 letter to counsel for Agri-Energy (¶19 in Dkt. 25-8) is outside the scope of this order.  Though the contents of the letter, its timing (and Agri-Energy's rejection of the proposal in that letter) relates to defendants' inequitable conduct theory, the letter itself is not a disclosure to the PTO.  The court is not convinced that the defendants need to probe Mr. Rye's strategies regarding that letter in order to fairly present their inequitable conduct defense.  The court has rejected the other document requests because they either (a) seek attorney-client communications (¶¶ 2, 6, 13, 15, 20); (b) seek documents in categories more broadly than the court has permitted and to the extent that their categories subsume documents the court is permitting, they duplicate requests the court has approved (¶¶ 3, 16); or are not sufficiently tied to PTO disclosures (¶¶ 10, 11, 14, 18).

[15]      As the court understands it, Dkt. 25-9 is the defendants' compilation of documents taken from CleanTech's main privilege log that they contend should be produced because of their inequitable conduct defense.

They must do so within 14 days of this order, and may include with their submission any additional descriptions (beyond what is in their privilege log) they believe are appropriate for the court to understand the context in which the documents were prepared.

There are several documents on the Dkt. 25-9 log labeled as attorney-client privileged but which do not appear to involve communications with a client. They are: GCS1803-1811; GCS1845-1847; GCS776-777; GCS789; GCS792; GCS1326; GCS1345-1346; GCS1347-1348; GCS1340-1343; GCS1344; GCS892-893; GCS894-895; GCS1993-1997; GCS898-902; GCS903-907; GCS908; GCS1349; GCS2040; GCS911-912; GCS2006; GCS2011-2016; GCS2022. These documents must either be produced to the defendants or also submitted to the court for *in camera* review, along with any explanation justifying withholding them as privileged.

## Conclusion

Mr. O'Brien and CleanTech must produce documents or submit them for *in camera* review within 14 days of this order. The parties should schedule Mr. O'Brien's deposition to take place within the next four weeks and should notify the court when the deposition date is scheduled. The magistrate judge will endeavor to be available to rule on any objections that may arise during the deposition.

So ORDERED.

Date: _06/30/2014_

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

**Distribution:**

**All ECF-registered counsel of record via email generated by the court's ECF system**